### IN THE UNITED STATES DISTRICT COURT FOR
### THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **MK FEENEY**<br>**Philadelphia, PA** | |
| **Plaintiff,** | **CIVIL ACTION NO.** |
| **v.** | **JURY TRIAL DEMANDED** |
| **CITY OF PHILADELPHIA, Office**<br>**of the District Attorney**<br>**Three South Penn Square**<br>**Philadelphia, PA 19107** | |
| **AND** | |
| **R. SETH WILLIAMS**<br>**In his official capacity and individually** | |
| **Defendants** | |

## COMPLAINT

## INTRODUCTION

Plaintiff, MK Feeney, brings this action against her former employer, City of Philadelphia, Office of District Attorney, and against R. Seth Williams, individually and in his official capacity.  Plaintiff alleges that Defendants discriminated against her on the basis of her race and further, acting individually and in concert, deprived her of her guaranteed Constitutional rights under the Fourteenth Amendment of the Unites States Constitution,  in violation of Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. §200e, et seq. ("Title VII"), the Pennsylvania Human Relations Act, as amended, 43 P.S. §951, et seq. ("PHRA"), the Civil Rights Act of 1866, as amended, 42 U.S.C. §1981 ("Section 1981") and 42 U. S. C. § 1983 ("Section 1983") .  To remedy and redress the Defendants' wrongful and unlawful conduct, Plaintiff is seeking declaratory and injunctive relief and damages, including but not limited to compensatory damages for loss of income; compensatory damages for pain and suffering, emotional distress, anxiety, harm to her reputation, personal indignity, embarrassment, humiliation and damage to honor and integrity; punitive damages;  attorney fees and costs; and all other relief this Court deems appropriate.

## PARTIES

1.      Plaintiff, MK Feeney, is an individual and a citizen of the Commonwealth of Pennsylvania.  She resides in Philadelphia, Pennsylvania.

2.      Plaintiff is white.

3.      Defendant, City of Philadelphia, ("City") is a political subdivision of the Commonwealth of Pennsylvania, that is, a City of the First Class, with its principal office located at 3 South Penn Square, Philadelphia, PA 19107.

4.      The Office of the District Attorney is a department of the City, with its principal office located at 3 South Penn Square, Philadelphia, PA 19107.

5.      Defendant R. Seth Williams ("Mr. Williams") is an individual residing in the City of Philadelphia and at all relevant times was employed by Defendant City as the Philadelphia District Attorney.  At all times relevant hereto, Mr. Williams was acting in both his official capacity and as an individual.

2

6.      At all times relevant hereto, Mr. Williams had the authority of City to effectuate its policies and customs and was acting within the scope of his employment on behalf of City.

7.      At all times relevant hereto, Mr. Williams was the supervisor, final decision-maker and policy maker for the Office of the District Attorney, and possessed the authority and discretion to establish policies, customs, practices and decisions concerning employment matters in the Office of the District Attorney.

8.      At all times relevant hereto, Defendants had a policy, custom and practice of making employment decisions in the office of the District Attorney based on race, giving non-white individuals more favorable treatment than similarly situated white individuals in connection with decisions regarding hiring, termination, discipline and other terms and conditions of employment.

9.      At all times relevant hereto, Defendants instituted, acquiesced in, ratified and/or took actions against Plaintiff and other white employees which were motivated in whole or in part by unlawful and illegal consideration of  race.

10.      At all times relevant hereto, Mr. Williams personally engaged in, condoned and/or knowingly acquiesced to the wrongful conduct alleged herein, which conduct violated clearly established statutory and/or constitutional rights, the existence of which a reasonable person would have known.

11.      At all times material hereto, Defendants acted by and through their authorized agents, servants, workmen and/or employees acting within the course and scope of their employment with Defendants and in furtherance of Defendants' business.

3

12.     At all times material hereto, City employed more than fifteen (15) people.

13.      At all times material hereto, City acted as an employer within the meanings of the statutes which form the basis of this matter.

14.     At all times material hereto, Plaintiff was an employee of City within the meanings of the statutes which form the basis of this matter.

15.     At all times material hereto, Defendants acted under color of state law.

## JURISDICTION AND VENUE

16.     The causes of action which form the basis of this matter arise under Title VII, the PHRA, Section 1981 and Section 1983.

17.     The District Court has jurisdiction over Count I (Title VII) pursuant to 28 U.S.C. §2000e-5 and 28 U.S.C. §1331.

18.     The District Court has supplemental jurisdiction over Count II (PHRA), pursuant to 28 U.S.C. §1367.

19.     The District Court has jurisdiction over Count III (Section 1981), pursuant to 42 U.S.C. §1981 and 28 U.S.C. § 1331.

20.     The District Court has jurisdiction over count IV (section 1983) pursuant to pursuant to 28 U.S.C. 1331 and 1343.

21.     Venue is proper in the District Court under 28 U.S.C. §1391(b) and 42 U.S.C. §2000e-5(f).

22.     On or about November 10, 2011, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining of acts of discrimination alleged herein.  Plaintiff's Charge was cross-filed with the Pennsylvania Human Relations Commission.  Attached hereto, incorporated herein and marked as Exhibit "1" is a true and correct copy of the EEOC Charge of Discrimination (with personal identifying information redacted).

23.     On or about March 26, 2013, the Civil Rights Division of the United States Department of Justice issued Plaintiff a Notice of Right to Sue under Title VII.  Attached hereto, incorporated herein and marked as Exhibit "2" is a true and correct copy of that notice.

24.     Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

## FACTUAL ALLEGATIONS

25.     Plaintiff was an Assistant District Attorney ("ADA") in the Philadelphia District Attorney's Office from the time of her hire in February, 1996, until Defendants terminated her employment on June 23, 2011.

26.     At the time of Plaintiff's hire, the District Attorney was Lynne Abraham (white).

27.     From 1996 to 2005, Plaintiff worked in various trial units, including Municipal Court, Juvenile, Felony Waivers, and Major Trials.  Plaintiff also did a rotation in the Charging Unit, as was required by every Waivers Unit ADA.

28.     In or around May, 2005, Plaintiff was promoted to work in the Homicide Unit, where she worked until her termination.   She reported directly to Edward McCann (white), then Chief of Homicide.

29.     Throughout her more than fifteen (15) years of employment with Defendant City, Plaintiff consistently performed her duties in a highly competent manner.

30.     In or around May, 2009, Mr. Williams (black) won the Democratic primary election for District Attorney.

31.     On January 4, 2010, Mr. Williams began his term as the Philadelphia District Attorney.

32.     After Mr. Williams took office, he appointed Joseph McGettigan (white) as First Assistant District Attorney.

33.     After Mr. Williams took office, he promoted Mr. McCann from Chief of the Homicide Unit to the position of Deputy of Trials.

34.      On or around June 1, 2011, Mr. McGettigan left the District Attorney's Office and Mr. McCann was promoted by Mr. Williams to the position of Acting First District Attorney.

35.     At all times relevant, Mr. McCann reported directly to Mr. Williams.

36.     After Mr. Williams became the District Attorney, Defendants engaged in a policy, practice and custom to consider race in connection with employment decisions

within the District Attorney's Office and treat non-white employees more favorably than similarly situated white employees, including, but not limited to:

    a)    Disciplining white employees more harshly than similarly situated non-white employees;

    b)    Investigating the publication of private information about non-white employees but not the publication of private information about white employees;

    c)    promoting non-white employees into open positions over qualified white employees;

    d)    removing qualified white employees and replacing them with non-white employees;

    e)    selecting non-white individuals for newly created positions without posting the position and giving qualified white individuals an opportunity to be considered;

    f)    considering the racial demographics of City in making personnel decisions regarding  hire, termination and/or job assignment;

    g)    waiving job requirements for non-white employees but not for similarly situated white employees.

    37.    Defendants failed to adhere to, enforce and/or implement City's declared policy prohibiting employment discrimination based upon race.

38.     Defendants' failure to adhere to, enforce and/or implement City's declared policy prohibiting employment discrimination based upon race was willful.

39.     On or about June 2, 2011, the Philadelphia Inquirer published an article about turmoil in the DA's office, including the sudden departure of Mr. McGettigan.

40.     The June 2, 2011 Philadelphia Inquirer article also made reference to an unidentified black ADA with a record of multiple criminal arrests who was hired by Defendants after Mr. Williams took office. According to the article, this individual ("Aforementioned ADA") had been arrested multiple times in the past for drug charges in Philadelphia.

41.     Before becoming an ADA, the Aforementioned ADA had gone on national television and discussed the fact that he was shot and purposefully did not talk to the police because he did not believe in "snitching."

42.     After the June 2, 2011 Inquirer article was published, Mr. Williams called a meeting of all the ADAs in the District Attorney's office and admonished them. He stated that one or more ADAs had thrown their colleague "under the bus" and that Mr. Williams was personally offended. Mr. Williams said that he found it highly unacceptable for people to talk to the press about what goes on in the office.

43.     At all times relevant hereto, Defendants had no policy against speaking to the press.

44.     Following publication of the press article and Mr. William's meeting concerning same, the District Attorney's Office conducted an internal investigation to determine who had gone to the press.

45.     On June 6, 2012, Plaintiff was interrogated by Mr. McCann, Curtis Douglas, Deputy of Special Investigations and Patrick Blessington, Chief of Special Investigations, about a conversation she had previously had concerning a Preliminary Arraignment Reporting System ("PARS") report  involving the Aforementioned ADA.

46.     There were a number of ADAs in the office who had pulled the PARs report on the Aforementioned ADA due to rumors about his past.

47.     Although Plaintiff had seen the PARs report on the Aforementioned ADA, she personally did not pull up the report and she did not go to the press concerning the Aforementioned ADA.

48.     During Defendants' interrogation of Plaintiff, Plaintiff was truthful and answered all questions to the best of her ability.

49.     Plaintiff was not asked by her interrogators whether she had gone to the press about the Aforementioned ADA, but Plaintiff volunteered that she had not.

50.     Another individual whom Defendants interrogated about the press incident involving the Aforementioned ADA was a black ADA who was a colleague of Plaintiff's in the Homicide Unit ("Colleague").

51.     Plaintiff and the Colleague had previously had a conversation about the PARS report on the Aforementioned ADA, which conversation was the subject of Defendant's interrogation of Plaintiff on June 6, 2012.

52.     Plaintiff's Colleague is one individual who had told the press about the aforementioned ADA.

53.     On June 23, 2011, Mr. McCann called Plaintiff into the First Assistant's office and told Plaintiff that her employment was terminated, effective immediately.

54.     Plaintiff asked Mr. McCann why she was being fired.  He said the reason was because Defendants believed she had "been untruthful" during her interrogation on June 6, 2012.

55.     Plaintiff told Mr. McCann that she had not lied, and asked him to tell her what Defendant believed she had lied about so that she could explain, clarify or defend herself.  However, Mr. McCann refused to tell Plaintiff what supposed untruth she was alleged to have committed, much less what the factual basis was for such accusation.

56.     Mr. McCann told Plaintiff that the decision to terminate her employment had not been made by him.

57.     After abruptly terminating Plaintiff, Defendants humiliated her further by having her immediately escorted from the building by police.

58.     Plaintiff has not been permitted to return to the building since her termination.  The personal effects that Plaintiff had kept in her office were sent to her.  However, Defendants failed to return Plaintiff's personal notebooks for months.

Moreover, Defendants never returned the personal file Plaintiff had kept in her office containing numerous letters of commendation she had received over the years for her work as an ADA.

59.    Plaintiff's letters of commendation were also maintained in her personnel file.  However, when Plaintiff received a copy of her personnel file, which she requested after her termination, numerous letters of commendation were missing.

60.    Mr. Williams was personally involved in the decision to terminate Plaintiff's employment and/or approved, acquiesced in or condoned such decision.

61.    Defendants never provided Plaintiff with an explanation of what Defendants believe she lied about.

62.    Defendants' stated reason for terminating Plaintiff was unsubstantiated, and false and pretextual.

63.    Defendants' refusal to articulate what it believes Plaintiff lied about and afford her an opportunity to clear up any misunderstanding demonstrates the pretextual nature of any purported legitimate reason offered by Defendant.

64.    Plaintiff's black Colleague, who had discussed the PARS report with Plaintiff and who had actually gone to the press about the Aforementioned ADA, was also disciplined but was not fired.  Instead, Plaintiff's black Colleague was transferred from the Homicide Unit to a less prestigious unit within the District Attorney's Office and he continued to make the same salary that he had been making prior to his transfer.

65.    Mr. Williams, Plaintiff's Colleague, and the Aforementioned ADA referenced in the June 2, 2011 press article, are all members of the same fraternity, Alpha Phi Alpha, a fraternity for African American males.

66.    Plaintiff was treated less favorably and disciplined more harshly than similarly situated, non-white employees.

67.    Plaintiff's race was a motivating and/or determinative factor in Defendants' decision to terminate her employment.

68.    Defendant's unequal, raced-based treatment of Plaintiff was consistent with, and part of, Defendants' policy, practice and custom to consider race in connection with employment decisions and to treat non-white employees more favorably than similarly situated white employees in the office of the District Attorney.

69.    In or around May, 2011, there were articles published in the Philadelphia Inquirer and the Daily News about an ADA (white), who had become involved with a victim of one of her cases who was an alleged drug dealer in Philadelphia.  The white ADA was personally named in the press articles and her photograph was published.

70.    Despite the fact that Defendants were aware that one or more employees in the DA's office had gone to the press about improprieties concerning a white ADA, and in sharp contrast to Defendant's reaction regarding the press leak involving the Aforementioned ADA who was black and whose name and photograph did not appear in the press, Defendants failed to conduct any investigation to determine which employee(s) had gone to the press regarding the white ADA's improprieties.

71.     Similar to the situation regarding the Aforementioned ADA, a number of ADAs had pulled the PARs report on the alleged drug dealer who was the boyfriend of the white ADA and circulated it around the office.  His arrest photo was also pulled and circulated.  However, Defendants made no effort to determine the individuals responsible for pulling the PARS report and arrest photo and/or gossiping about the white ADA's improprieties, and no employee was ever reprimanded or disciplined for doing so.

72.     After Mr. Williams became the District Attorney, Defendants promoted a black ADA to the Homicide Unit, notwithstanding that this individual had been demoted from the Homicide Unit in 2004 for altering a statement in a capital case and lying to her supervisor and a judge about her alteration.

73.     In or around the fall of 2010, a search warrant was executed for the home of a black employee in the Charging Unit and it was discovered that drugs were being sold out of her home.  Rather than fire her, Defendants decided to transfer this individual to the "Community Action Center" and permit her to continue her employment with Defendants.

74.     Before Mr. Williams became the District Attorney, the position of Head of Victim Services was held by a qualified white employee who had held the position since 1999.  One of her direct reports was black.  After Mr. Williams became the District Attorney, Defendants reversed the reporting relationship of these two individuals such that the black employee was promoted to Head of Victim Service and the incumbent white employee was demoted to the black employee's former position.

75.     After Defendant Williams became the District Attorney, he reached out to several former ADAs, almost all of whom are non-white, to see if they were interested in returning to the DA's office under his administration.

76.     In or around June, 2010, The District Attorney's office underwent a reduction in force in which at least (5) ADAs were terminated, all of whom were white except one.  Two of the white ADAs who were terminated by Defendants had been long term employees with the District Attorney's office.

77.     Contrary to the written recommendation of the Hiring Committee, Defendants hired a Hispanic ADA who had interned under the prior Administration but had not been hired due to lack of qualifications.  Mr. Williams acknowledged the Hiring Committee's recommendation but said that he was not going to follow it.  This particular ADA's step-father, who is black, was a county detective who worked with the District Attorney's office.

78.     Defendants removed a qualified white lieutenant from the position of being in charge of the detectives in the Homicide Unit and replaced him with a black sergeant.

79.     Defendants removed a qualified white ADA from Head of the Hiring Committee for the District Attorney's office, a position which she had held for approximately twenty-five (25) years, and replaced her with a black ADA.

80.     A qualified white ADA in the position of a Unit Chief was told that she was going to be demoted and replaced by another ADA (black) whom Mr. Williams was seeking to promote.   Only after a black acquaintance from the police department called

14

Mr. Williams on the white ADA's behalf, was the white ADA allowed her to keep her position.

81.     A black ADA voluntarily left the District Attorney's office for personal reasons.  In her exit interview, Defendants offered her the chance to live outside the city of Philadelphia.  This was in direct violation of the City charter and a stated policy of the District Attorney's office.

82.     Mr. Williams actively ignored the Hiring Committee's scoring and ranking of candidates and hand-picked the individuals he wanted to receive job offers.  The individuals Defendant Williams hand-picked were predominantly non-white.

83.     Mr. Williams made comments to the Hiring Committee that he wanted them to hire people who "look like Philadelphians" meaning that Mr. Williams wanted them to hire individuals based on the racial demographics of the City.

84.     When the aforementioned ADA had his hiring interview with the Hiring Committee, Mr. Williams walked into the interview room in front of the hiring panel with his arm around the aforementioned ADA, sending a clear message to the Committee to hire this individual irrespective of their independent assessment of his qualifications.

85.     Mr. Williams offered a black ADA a substantial raise in order to prevent her from leaving for another job, and told her that he needed people who look like her in front of his juries.

86.     Mr. Williams hand-picked and hired almost exclusively non-white individuals for his support staff and has provided some of these individuals with salaries that exceed the ADAs' salaries.  Examples include, but are not limited to:

        a)     Director of Hispanic Outreach (Hispanic), $60,000 salary. This position, which, upon information and belief was not posted, was created by Defendants specifically for this individual;

        b)     Director of Community Engagement and Employee Enrichment (black), $75,000 salary.  This position, which, upon information and belief was not posted, was created by Defendants specifically for this individual;

        c)     Director of Communications (black), $99,000 salary.  This individual was hired by Mr. Williams and Defendant to replace a white individual.  Upon information and belief, this position was not posted;

        d)     Director of the Community Action Centers (black), $71,000 salary.  This position, which, upon information and belief was not posted, was created by Defendants specifically for this individual;

        e)     Director of Truancy Prevention (Hispanic), $77,680 salary. Upon information and belief, this position was not posted;

        f)     Director of Community Outreach and Governmental Relations (black), $76,500 salary.

87.     Although it is generally office policy to circulate an intra-office communication announcing new hires, Defendants failed to inform the rest of the office

16

via the customary intra-office communication, that several of the individuals referenced above were hired.

88.     Mr. Williams routinely attended the going-away parties for minority employees in the DA's office  and made speeches, but did not attend the going-away parties for white ADAs who left the office, unless the person was politically connected or otherwise in a highly visible position.

89.     Defendants commissioned a large mural for the lobby of the DA's office, in which all the individuals depicted are non-white.

90.     The joint and several discriminatory conduct of Defendants as outlined above was so outrageous as to shock the conscience.

91.     As a direct and proximate result of Defendants' discriminatory conduct toward Plaintiff, Plaintiff has suffered and continues to suffer deprivation of income and benefits, loss of job opportunities and/or earning capacity, loss of reputation, pain and suffering, mental anguish, emotional distress, embarrassment, humiliation, loss of self-esteem, and loss of life's pleasures, the full extent of which is not known as this time.

92.     In that Defendants' actions were outrageous and malicious, Plaintiff requests both compensatory and punitive damages, if applicable, and all relief to which she is statutorily entitled including costs and attorney's fees.

## COUNT I

### (VIOLATION OF TITLE VII)
### (Plaintiff v. City)

93.     Plaintiff incorporates by reference the averments of the preceding paragraphs as though fully set forth herein.

94.     By committing the foregoing acts of discrimination against Plaintiff, Defendant has violated Title VII.

95.     Said violations were willful and intentional and warrant the imposition of punitive damages.

96.     As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered the damages and losses set forth herein and incurred attorney fees and costs.

97.     No previous application has been made for the relief requested herein.

## COUNT II

### (VIOLATION OF PENNSYLVANIA HUMAN RELATIONS ACT)
### (Plaintiff v. City and Williams)

98.     Plaintiff incorporates by reference the averments of the preceding paragraphs as though fully set forth herein.

99.     Mr. Williams aided and abetted in the discrimination to which Plaintiff was subjected.

100.    Defendants, by the above improper and discriminatory acts, have violated the PHRA.

101.   As a direct and proximate result of Defendants' violation of the PHRA, Plaintiff has sustained the injuries, damages, and losses set forth herein and has incurred attorney's fees.

102.   No previous application has been made for the relief requested herein.

## COUNT III

### VIOLATION OF SECTION 1981
### (Plaintiff v. City and Williams)

103.   Plaintiff incorporates by reference all of the above paragraphs as though they were fully set forth herein.

104.   By committing the foregoing acts of discrimination, Defendants have violated Section 1981.

105.   Defendants' violations of Section 1981 were malicious and/or committed with reckless indifference to the statutory rights of Plaintiff and warrant the imposition of punitive damages.

106.   As a direct and proximate result of Defendants' violations of Section 1981, Plaintiff has sustained the injuries, damages and losses as set forth herein and has incurred attorneys' fees and costs.

107.   Plaintiff is now suffering, and will continue to suffer, irreparable harm and monetary damages as a result of Defendants' discriminatory conduct unless and until this Court grants the relief requested herein.

108.   No previous application has been made for the relief requested herein.

## COUNT IV

**(VIOLATION OF SECTION 1983- 14th AMENDMENT- EQUAL PROTECTION)**
**(Plaintiff v. City and Williams, in his official capacity and individual capacity)**

109.   Plaintiff incorporates by reference all of the above paragraphs as though they were more fully set forth herein.

110.   The aforesaid conduct of Defendants, individually, jointly and in concert, acting under color of state law, deprived Plaintiff of equal protection under the law as guaranteed by the Fourteenth Amendment of the United States Constitution.

111.   The said constitutional violation implemented a policy, practice, custom and/or decision to treat non-white employees in the District Attorney's office  more favorably than white employees, which policy, practice, custom and/or decision  was committed, directed, implemented and/or ratified by agents and officials of the City who had policymaking and decision making authority.

112.   The conduct of Defendants as aforesaid was personally directed by Defendant Williams and/or Defendant Williams had actual knowledge of the conduct and acquiesced to it.

113.   As a direct and proximate result of Defendants' acts and conduct which caused and continue to cause Plaintiff be denied equal protection under the law, Plaintiff has suffered and will suffer those injuries, damages and losses alleged herein and has incurred and will incur attorney fees and costs.

114.   The wrongful acts and conduct of Defendants were willful, intentional, done with reckless indifference to Plaintiff's protected rights and/or were sufficiently egregious and reprehensible to warrant an award of punitive damages.

## RELIEF

WHEREFORE, Plaintiff seeks damages and specifically prays that the Court grant the following relief,

(a)  declaring the acts and practices complained of herein to be in violation of Title VII;

(b)  declaring the acts and practices complained of herein to be in violation of the PHRA;

(c)  declaring the acts and practices complained of herein to be in violation of Section 1981;

(d)  declaring the acts and practices complained of herein to be in violation of Section 1983;

(e)  enjoining Defendants from engaging in unlawful discriminatory employment practices and procedures based on race, including all race-based terminations and disciplinary decisions;

(f)  entering judgment against the Defendants and in favor of the Plaintiff in an amount to be determined;

(g)  awarding compensatory damages to make the Plaintiff whole for all lost earnings, earning capacity and benefits, past future, which Plaintiff has suffered or may suffer as a result of Defendant's improper conduct;

(h)  awarding compensatory damages to Plaintiff for past and future pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, which Plaintiff has suffered or may suffer as a result of Defendant's improper conduct;

(i)     awarding punitive damages to Plaintiff under Title VII, Section 1981 and

        Section 1983;

(j)     awarding Plaintiff such other legal and/or equitable relief as permitted

        under Title VII, the PHRA, Section 1981 and Section 1983;.

(k)     awarding Plaintiff the costs of suit, expert fees and other disbursements,

        and reasonable attorney's fees; and,

(l)     granting such other and further relief as this Court may deem just and

        proper.



CONSOLE LAW OFFICES LLC


Dated: 5-20-13         BY: *Marjory P. Albee*
                            Marjory P. Albee
                            Stephen G. Console
                            1525 Locust St., 9th Floor
                            Philadelphia, PA 19102
                            (215) 545-7676
                            (215) 545-8211 (fax)

                            Attorneys for Plaintiff,
                            MK. Feeney

# EXHIBIT 1

| **CHARGE OF DISCRIMINATION** | AGENCY<br>☐ FEPA<br>X EEOC | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See privacy statement before consolidating this form. | | |

| STATE OR LOCAL AGENCY  PHRC | |
|---|---|

| NAME (Indicate Mr., **Ms.,** Mrs.)<br>**MK Feeney** | HOME TELEPHONE NUMBER *(Include Area Code)*<br>████████ |
|---|---|

| STREET ADDRESS<br>████████ | CITY, STATE AND ZIP<br>Philadelphia, PA 19148 | DATE OF BIRTH<br>████████ |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP, COMMITTEE, STATE OF LOCAL GOVERNMENT WHO DISCRIMINATED AGAINST ME (If more than one than list below)

| NAME<br>**City of Philadelphia, District Attorney's Office** | NUMBER OF EMPLOYEES, MEMBERS<br>500+ | TELEPHONE (Include Area Code) |
|---|---|---|

| STREET ADDRESS<br>3 South Penn Square | CITY, STATE AND ZIP<br>Philadelphia, PA 19107 | COUNTY<br>Phila. |
|---|---|---|

| CAUSE OF DISCRIMINATION *(Check appropriate box(es))*<br>**X** Race    Color   **X** Sex    Religion    National Origin<br>Retaliation   Age   Disability   Other *(Specify)* | DATE DISCRIMINATION TOOK PLACE<br>*Earliest*              *Latest* 6/23/2011<br>Continuing Violation |
|---|---|

THE PARTICULARS ARE:

A.  1. Relevant Work History

I was originally hired by Respondent as an Assistant District Attorney (ADA) in Municipal Court in February, 1996, under Lynne Abraham (white), District Attorney, and Arnold Gordon (white), First Assistant District Attorney.  From 1996 to 2005, I worked my way through four separate trial units as per the normal progression of ADAs at that time.  Around May, 2005, I was promoted to work in the Homicide Unit.  On January 4, 2010, Seth Williams (black) began his term as District Attorney.  Although Joseph McGettigan (white) was the First Assistant District Attorney when Mr. Williams took office, on or around June 1, 2011, Mr. McGettigan left the

| X I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY - (when necessary for State and Local Requirements) |
|---|---|
| | I swear of affirm that I have read the above charge and that it is true to the best of my knowledge information and belief. |
| I declare under penalty or perjury that the foregoing is true and correct. | |

| Date:<br>11/10/11      Charging Party (Signature)<br>*[signature]* | SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day Month, and year) |
|---|---|

**EEOC Charge of Discrimination**
**Page 2 of 10**
**Initials of Charging Party - MF**

office and Edward McCann (white) became the Acting First ADA.  Throughout my fifteen year employment with Respondent, I have consistently received positive feedback and performance evaluations.  On a rating scale of 1-5, with 5 as the highest, I always received ratings of 3-5.

   2.  Harm Summary

   I have been discriminated against and subjected to a hostile work environment based on my race (white) and sex (female).  Mr. Williams and Respondent consider race and sex in employment decisions.  Furthermore, Mr. Williams and Respondent treat female employees differently than male employees.  Evidence of this discriminatory conduct and hostile work environment includes, but is not limited to, the following:

     a)  Despite my lengthy tenure at the DA's office and my consistent positive performance evaluations, I was terminated on June 23, 2011.

     b)  When I asked the reason for my termination, I was told by Mr. McCann that it was because they believed that I "had been untruthful" when they had questioned me about the ▮▮▮▮▮▮ (black) press incident (see below).  When I asked him what I had been allegedly untruthful about, he replied "we're not going to get into that right now."  I told him that I did not lie, that I was not a liar, and I repeatedly asked him to give me examples of my supposed lies.  He finally replied, "I think you were pretty much untruthful about everything."  I was escorted out of the building by police and have not been allowed to return inside the building.  This is a false and pretextual reason, as I was truthful in my interrogation. The fact that I was included on Mr. Williams' list of people to terminate (see below) further establishes that Respondent's reason is pretextual, as the decision to terminate me predates the event for which I was told I was fired.

     c)  ▮▮▮▮▮▮▮▮ (black), a fellow Homicide ADA, was one individual who went to the press about ▮▮▮▮▮▮▮. ▮▮▮▮▮▮ was not fired. ▮▮▮▮▮▮▮▮ was transferred to another Unit within the DA's office and continued to make the same salary that he had been making.

**EEOC Charge of Discrimination**
**Page 3 of 10**
**Initials of Charging Party – MF**

d) Prior to my termination, Mr. McCann, Curtis Douglas (black), Deputy of Special Investigations, and Patrick Blessington (white), Chief of Special Investigations, interrogated me about a conversation I had concerning a PARS (Preliminary Arraignment Reporting System) report. The conversation in question took place the day before a story was published in the press regarding ADA ████, who had previously been arrested and charged for drug dealing (see below). Over the past several months, many ADAs in the office had pulled the PARS report on ████ due to the rumors about his past. Although I had seen the PARS report from a number of other ADAs, I never pulled the PARS report on ████ and I answered the questions truthfully and to the best of my ability. Although they did not ask me, I volunteered that I did not go to the press about ██████.

e) In June, 2011, there was an article published in the Philadelphia Inquirer about ██████. ██████ had been arrested multiple times in the past for drug charges in Philadelphia. In 2007, ██████ also went on national television and discussed the fact that he was shot and purposefully did not talk to the police because he did not believe in "snitching." After the 2011 story broke, the DA's office conducted lengthy investigations into who went to the press about ██████, including interrogations of both ██████ and myself.

f) Mr. Williams, ██████, and ██████ are all members of the same fraternity, Alpha Phi Alpha, a fraternity for African American males.

g) In May, 2011, there were articles published in the Philadelphia Inquirer and the Daily News about ██████ (white). ████ is an ADA who had become involved with a victim of one of her cases. The victim was also a drug dealer in Philadelphia. Multiple stories, some including her photograph, ran in the press about ██████. After the story broke and despite having information that one or more employees of the DA's office went to the media, the office did nothing to investigate who went to the press about ██████.

h) Similar to the situation with ██████, a number of ADAs pulled the PARS and even the arrest photo on ██████'s boyfriend and were spreading this information around the office. Unlike the

**EEOC Charge of Discrimination**
**Page 4 of 10**
**Initials of Charging Party – MF**

situation with ███████ Respondent never tried to determine the individuals responsible.

i) In fall, 2009, ███████ told me that Mr. Williams had a list of people he wanted to fire. ███████ told me that I was on that list (see below);

j) In or about January, 2010, I received a call from former ADA ███████ (white). He relayed information about an event at which Mr. Williams was present. A detective at this event asked Mr. Williams if he was going to get money in his budget to "buy some balls" for his homicide DAs and there were many DAs in the Unit who had no balls and did not try cases. Mr. Williams immediately said "like who? Like MK Feeney?" to which the Detective replied "no, not like her…she is the one of the ones who actually has some balls and does her job."

k) Mr. Williams attended the going-away parties for minorities and made speeches, but would not go to the going-away parties for white ADAs who left the Office unless the person was a "big" ADA –a Homicide ADA, for instance, or an especially politically connected ADA.

l) In addition to my termination, Mr. Williams and Respondent implemented numerous personnel decisions that evidence a bias against whites and/or females.

m) While I was terminated without cause, in approximately 2004, a black Homicide ADA, ███████, altered a statement in a capital case. She did not convey this information to anyone and this detail was later discovered by the defense. ███████ also made false statements to both her supervisor and a judge about her alteration. As a result of these actions, there was a court hearing and the case was reassigned to another ADA. ███████ was then demoted to Major Trials. When Mr. Williams became DA, he promoted ███████ to the Homicide Unit.

n) ███████ (black) was a long time civil service employee who worked as a clerk in the Charging Unit. In or about fall, 2010, it came to light that a search warrant had been executed for ███████ home and it was discovered that drugs were being sold out of her home. Mr. Williams/Respondent did not fire ███████ but moved her to the "Community Action Center," a satellite

office, a project that Mr. Williams initiated after taking office.

o) ███████████ (white) was the Head of Victim Services since approximately 1999. One of her direct reports was ███████████ (black). When Mr. Williams became DA, he/Respondent made ███████████ the Head of Victim Services and had ███████████ report to ███████████ No reason was given for this demotion or for this direct change in reporting.

p) Shortly after taking office, Mr. Williams/Respondent fired ███████████ ███████████ (white) who had been the Chief of the Charging Unit for at least fourteen (14) years.

q) Mr. Williams/Respondent hired ███████████ (black) to replace ███████████ (white) as Deputy of Investigations.

r) Around June, 2010, Mr. Williams/Respondent fired ADA ███████████ ███████████ (white), who had been at the DAs office approximately twelve (12) years.

s) Around June, 2010, Mr. Williams/Respondent fired ADA ███████████ ███████████ (white), who had been at the Office for over ten (10) years.

t) Around June, 2010, ███████████ (Hispanic), who had been at the office for less than eight (8) years, was supposed to be fired due to poor performance, but Mr. Williams/Respondent instead transferred ███████████ to a different unit.

u) Mr. Williams/Respondent replaced ███████████ (white) who had been the Head of the Hiring Committee for the DA's office for approximately 25 years, with ███████████ (black).

v) In the same week, Mr. Williams/Respondent replaced ███████████ ███████████ (same as above) who was also the Chief of the Legislation Unit, with ███████████ (white).

w) Mr. Williams/Respondent demoted ███████████ (white) from Assistant Chief of Majors to just a regular ADA in the Special Investigations Unit.

**EEOC Charge of Discrimination**
**Page 6 of 10**
**Initials of Charging Party – MF**

x) Mr. Williams/Respondent demoted ▮▮▮▮▮▮▮▮(white) from Chief of the Repeat Offender Unit to Assistant Chief of Majors.

y) Mr. Williams/Respondent fired ▮▮▮▮▮▮(white) as Chief Financial Officer in September, 2011.

z) Mr. Williams/Respondent removed Lieutenant ▮▮▮▮▮▮▮▮ (white), who was the DA detective in charge of the DA detectives in the Homicide Unit and replaced him with Sergeant ▮▮▮▮ ▮▮▮▮ (black).

aa) ▮▮▮▮▮▮▮▮ (black) was an ADA who left the DA's office for financial reasons. In her exit interview, Mr. Williams offered ▮▮ ▮▮▮▮ the chance to live outside the city of Philadelphia in order to save money. This is in direct violation of the city charter and of our mandate as District Attorneys as well.

bb) Individuals on the Hiring Committee reported that Mr. Williams actively ignored the Hiring Committee's scoring and ranking of candidates and hand-picked the individuals he wanted to receive job offers. The individuals Mr. Williams hand-picked were predominantly black.

cc) Mr. Williams made comments to the Hiring Committee that he wanted them to hire people who "look like Philadelphians," which several people took to mean that Mr. Williams wanted them to hire predominantly black individuals.

dd) When ▮▮▮▮▮▮ had his panel interview, Mr. Williams walked into the interview room in front of the ADAs on the hiring panel with his arm around ▮▮▮▮▮▮. This is completely improper; the DA has no place in the panel interview, and the interviews are not held anywhere near Mr. Williams' office.

ee) I believe that Mr. Williams maintained a list of people to terminate/demote. Based on information from other people, as well as personnel decisions, I believe that the list was composed of primarily white individuals. I believe the list included, but was not limited, to the following individuals:

1. ▮▮▮▮▮▮▮ (white). ▮▮▮▮▮▮ was the Deputy of Trials and prior to that, was the Deputy of Juvenile. Mr. Williams/Respondent demoted ▮▮▮▮▮▮;

**EEOC Charge of Discrimination**
**Page 7 of 10**
**Initials of Charging Party – MF**

2. ████████████ (white).  Mr. Williams/Respondent removed ███████ from Chief of Majors in the Trial Division and made him Chief of Special Investigations;

3. ████████████ (white).  Mr. Williams/Respondent demoted ██████████ twice in one week.  See above for more information;

4. ██████████ (white).  See above for more information;

5. ████████████ (white), who is the Chief of Public Nuisance Task Force and Forfeiture.  ██████████ (black), First Deputy Police Commissioner, called Mr. Williams on ████████████ behalf to ensure that ██ ██████████ would not be terminated.

6. ████████████ (white) who had been working  at the Office for over thirteen (13) years has not been promoted to homicide despite his long tenure and good performance; and

7. Myself. My existence on the list predates the incident with ██████████, which establishes that Respondent's explanation for my termination is pretextual.

ff) Mr. Williams has hired almost exclusively non-white employees for his support staff and has provided some of these individuals with salaries that exceed the ADAs' salaries.  Additionally, although it is general office policy to send out an e-mail announcing new hires, Mr. Williams/Respondent failed to inform the rest of the office via the customary e-mails that several of the individuals below were hired.  They include the following individuals:

1. ████████████ (black), position unknown, $92,500 salary;

2. ████████████ (Hispanic), Director of Hispanic Outreach, $60,000 salary. Mr. Williams/ Respondent created this position specifically for ██ ██████████;

**EEOC Charge of Discrimination**
**Page 8 of 10**
**Initials of Charging Party – MF**

3. ████████████ (black), Director of
   Community Engagement and Employee Enrichment,
   $75,900 salary.  Mr. Williams/Respondent created this
   position specifically for ████████████;

4. ████████████ (black), Director of Communications,
   $99,000 salary. ████████████ replaced ████████
   ████████ (white);

5. ████████████ (black), Director of the Community
   Action Centers, $71,000 salary. Mr. Williams/
   Respondent created this position specifically for ████
   ████████;

6. ████████████ (Hispanic), Director of Truancy
   Prevention, $77,680 salary. There has not been such
   a position for at least five years; and

7. ████████████ (black), Director of Community Outreach
   and Government Relations, $76,500 salary.

gg) ████████████████████████████████████████████████
   ████ each make over $70,000 per year.  As a comparison, there
   are over one hundred forty (140) ADAs who make under $70,000
   per year.  This is over one-third (1/3) of all the ADAs in the office.

hh) Mr. Williams reached out to many former ADAs, almost all of
   whom are non-white, to see if they were interested in returning to
   the DA's office under his administration.  He offered many of them
   supervisory positions. This list of individuals included, but is not
   limited to the following:

   1. ████████████ (black);

   2. ████████████ (black);

   3. ████████████ (black);

   4. ████████████ (Hispanic);

   5. ████████████ (black); and

   6. ████████████ (black).

**EEOC Charge of Discrimination**
**Page 9 of 10**
**Initials of Charging Party – MF**

ii) Conversely, there were several white individuals who were promised employment opportunities and then told that there was no money to hire them. These individuals included, but are not limited to, the following:

1. ██████████████ (white); and

2. ████████ (white)

jj) Mr. Williams has repeatedly made inappropriate sexual comments to and about ████████ (Asian). ████████ has said that Mr. Williams made comments in front of her that embarrassed her and that she wondered about how to get him to stop. In addition, at an office-wide meeting for support staff, Mr. Williams made a comment along the lines of "I want everyone to look forward to coming to work, and not just because they get to see ████████ walking down the hall in front of them. I know I always want to come to work to see that." ████████ is part of the support staff and would have been at that meeting.

kk) Mr. Williams referenced females' physical appearances in the office, repeatedly introducing one particular female employee as "lovely."

C. Statutes and Basis for Allegations

I allege that Respondent's conduct, including without limitation, the conduct referenced herein, was discriminatory and created a hostile work environment based on my race and sex in violation of the Pennsylvania Human Relations Act, 43 P.S. §951 et seq. ("PHRA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII") and the Civil Rights Act of 1866, as amended, 42 U.S.C. §1981 ("Section 1981").

D. **Class Harm**

**I believe that Respondent has discriminated (disparate treatment and disparate impact) against white and/or female employees on a class-wide and pattern and practice basis. I bring this charge as a class action Charge on behalf of white and/or female employees, or applicants for employment, who have suffered an adverse action (including being subjected to a hostile work environment) because of their race (white), and/or sex (female).**

# EXHIBIT 2



**U.S. Department of Justice**

Civil Rights Division
NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

CERTIFIED MAIL
2018 7023

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4239*
*Washington, DC 20530*

March 26, 2013

Ms. M.K. Feeney
c/o Marjory P. Albee, Esquire
Console Law Offices
1525 Locust St. 9th Fl.
Philadelphia, PA  19102

Re:  EEOC Charge Against City of Philadelphia, Office of the District Attorney
    No. 530201200509

Dear Ms. Feeney:

    Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

    If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

    The investigative file pertaining to your case is located in the EEOC Philadelphia District Office, Philadelphia, PA.

    This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                  Sincerely,

                  Thomas E. Perez
             Assistant Attorney General
              Civil Rights Division

       by

             Karen L. Ferguson
          Supervisory Civil Rights Analyst
          Employment Litigation Section

cc: Philadelphia District Office, EEOC
    City of Philadelphia, Office of the District Attorney